UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| BILLIE J. HOWARD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. 1:13-cv-02039-SEB-TAB |
| | ) | |
| INDIANAPOLIS PUBLIC SCHOOLS, | ) | |
| COMMUNITY HEALTH | ) | |
| NETWORK/GALLAHUE MENTAL | ) | |
| HEALTH SERVICES, | ) | |
| | ) | |
| Defendants. | ) | |

## Introduction

This cause is before the Court on Defendants' Motions for Summary Judgment [Dkt. No. 120 (Indianapolis Public Schools ("IPS")); Dkt. No. 124 (Community Health Network/Gallahue Mental Health Services ("Community")], both filed on October 10, 2016 pursuant to Rule 56 of the Federal Rules of Civil Procedure.[1]  Plaintiff Billie J. Howard brought this action against Defendants IPS and Community alleging that she was discriminated against on the basis of her age in violation of the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 621, *et seq.* and on the basis of her race

---

[1] In her response to Defendants' motions for summary judgment, Ms. Howard cross-moved for summary judgment. Dkt Nos. 107. 141.  Defendants argue that Ms. Howard's motion for summary judgment was untimely; the October 26, 2015 deadline for dispositive motions had long since passed.  In addition to Ms. Howard's procedural error, her motion is not accompanied by admissible evidence.  *See* Fed R. Civ. P. 56(c)(2).  Even so, for the reasons detailed herein, Ms. Howard's claims fail as a matter of law.  Any motion for summary judgment asserted by Ms. Howard is DENIED.  Ms. Howard's request for oral argument is similarly DENIED.

1

in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e and 42 U.S.C. § 1981 ("§ 1981"); and that she was retaliated against for reporting inappropriate conduct, in violation of Title VII "and/or" the ADEA.

For the reasons detailed below, we **GRANT** summary judgment in favor of the Defendants.[2]

## **Factual Background**[3]

Plaintiff is a African-American female over the age of 40 who was employed by Community as a School-Based Therapist. She was assigned to IPS James A. Garfield School #31 ("IPS #31" or "School") for the 2013-14 school year. Following an incident on August 6, 2013, IPS requested that Ms. Howard not be placed in a position associated with IPS's emotional disabilities classrooms or IPS #31. Community terminated Ms. Howard after she was unable to secure another position at Community.

## A.      Agreement Between Community and IPS

Community provided counseling and mental health services to IPS's students through Community's school-based programs. Affidavit of Joan Reed[4] ("Reed Aff.") ¶ 4. The parties have submitted two documents related to their contractual agreement: a Professional Services/Consulting Agreement and a Proposal Response. IPS proffered a

---

[2] Defendant Community's Motion for Continuance of Trial Date [Dkt. No. 142] is DENIED as moot.

[3] Ms. Howard proffered several documents as evidence with her response to Defendants' motions for summary judgment to which Defendants objected on several grounds. Even considering Ms. Howard's evidence, we reach the same conclusions explicated herein.

[4] Joan Reed, Operations Director of the School-Based Program for Behavior Health Services, is a Community employee. Reed Aff. ¶ 3.

Professional Services/Consulting Agreement, purportedly authenticated through Ms. Howard's deposition; however, that agreement is not signed and Ms. Howard could not testify that she had seen it before.  Plaintiff's First Deposition taken on November 20, 2014 ("Pltf. First Dep.") at 59 ("I don't recall this document."), Ex. 12.  We assume that if Exhibit 12 were the agreement between IPS and Community, IPS could produce an executed copy, authenticated by an IPS employee.

Community submitted a portion of its Proposal Response as part of Ms. Reed's affidavit wherein she explained that the Proposal contained requirements to which Community agreed.  Reed Aff. ¶ 6, Ex. A.  Again, the Proposal does not bear the signature of either party and is an incomplete copy of that document.  *Id.*  It is unclear from the evidence whether the parties' agreement was ultimately reduced to writing and what was included in any such contract; however, Ms. Reed's undisputed testimony explains the parties' agreement and, thus, we accept Ms. Reed's attestations as to the terms of the contract between Community and IPS.

Community delivered counseling and mental health services to IPS by assigning Community-employed therapists to IPS schools.  Pursuant to the agreement between Community and IPS, "IPS did not decide who was placed in what school . . . [and] could not discipline Community employees or otherwise direct the work performed by Community employees under the contract."  Reed Aff. ¶ 5.[5]  Community "agree[d] to

---

[5] The Professional Services/Consulting Agreement states that "employees or agents of [Community] shall not be deemed or construed to be employees of [IPS] for any purposes whatsoever," and that "[n]othing in this agreement shall be construed to create or extend any rights to any third parties as third party beneficiaries."  Pltf. First Dep. at Ex. 12 ¶¶ 7,

immediately remove any service provider from service under [the Community-IPS]
contract for any reason upon request by IPS, and replace the removed provider with
qualified personnel." *Id.* ¶ 6, Ex. A ¶ 1.  It is undisputed that Ms. Howard did not
participate in the negotiations of any contract between Community and IPS.  Plaintiff's
Second Deposition taken on September 2, 2015 ("Pltf. Second Dep.") at 79:19-80:23.[6]

## B.     Plaintiff's Employment as a School-Based Therapist

Ms. Howard is a licensed Mental Health Professional Counselor and a Licensed
Clinical Addiction counselor.  Pltf. First Dep. at 11:12-12:3.  She was employed by
Community on two occasions: initially she worked as a Behavior Clinician "in or around
2007;" thereafter, she worked as a School-Based Therapist beginning in March 2013.  *Id.*
at 22:11-23:11; Pltf. Second Dep. at 11.  Her latter role as a School-Based Therapist is the
focus of this lawsuit.

On January 15, 2013, Ms. Howard submitted an application for employment to
Community, following which she was interviewed by Ms. Reed and two managers of the

---

13.    Further, the Professional Services/Consulting Agreement explicitly states that
"[n]othing in this agreement shall be construed to create or extend any rights to any third
parties as third party beneficiaries," where only IPS and Community are identified as
parties to the contract.  *Id.* ¶ 13.

[6] Ms. Howard complains that Defendants' attorneys engaged in "tactical joking, evasive
and dilatory practices," and violated the Rules of Professional Conduct during her
depositions.  Dkt. No. 107 (Pltf. Resp. to Mtns. for Summ. J.) at 10.  Ms. Howard has
provided no evidence of foul play by the Defendants or their counsel during her
depositions.  Furthermore, Ms. Howard was represented by counsel during the September
2, 2015, deposition, and we have no reason to believe that her attorney provided inadequate
representation.  Thus, we find no inappropriate or sanctionable conduct by Defendants at
this time.

school-based program.  Each interviewer was a Community employee at the time of the interview.  Pltf. First Dep. at 15:4-13; Reed Aff. ¶ 7.  Ms. Howard alleges that when she initially applied for a supervisory position with Community, she was informed by a "program director", whose name Ms. Howard could not recall, that she "would be better suited for the IPS position" and that Community "looked at employees from within and younger blood."  Pltf. Second Dep. at 94:1-11.  In any event, Ms. Howard was hired as a Community School-Based Therapist and on March 11, 2013, she began her employment, assigned to work with students at IPS #31 for the 2013-14 academic year.  Reed Aff. ¶ 7; Declaration of Ann Toombs Heiple[7] ("Heiple Decl.") ¶ 6.

From June 10, 2013 through the conclusion of her employment with Community, Ms. Howard reported to Community employee Destinee Floyd, who during that time was Program Manager I of Community's School-Based Program in Behavioral Health Services.  Affidavit of Destinee Floyd ("Floyd Aff.") ¶ 3.  Ms. Floyd reported to Ms. Reed, Operations Director of the School-Based Program for Behavioral Health Services.  Reed Aff. ¶¶ 3, 8.  For the duration of her employment as a School-Based Therapist, Ms. Howard received paychecks from Community, her benefits were arranged through Community, and she received her W-2 from Community.  Pltf. First Dep. at 42:2-6, 169:12-19, 58:4-16, Ex. 1.  Ms. Howard did not receive a W-2 from IPS at any time relevant to this action.  *Id.* at 58:21-24.  Community determined Ms. Howard's schedule, client hour expectations and documentation requirements, and Ms. Howard was subject to discipline by Community.

---

[7] Ann Toombs Heiple is Principal of IPS #31, and held this position during the 2012-13 and 2013-14 academic years.  Heiple Dec. ¶ 3.

*Id.* at 37:12-39:12, 51:8-25, 53:3-54:2.  Following her termination, Ms. Howard identified Community as her employer when she filed a wage claim with the Indiana Department of Labor and when she filed an Unemployment Insurance Appeal.  *Id.* at 77:7-24, Ex. 19; *id.* at 79:6-21, Ex. 20.

As a Community School-Based Therapist assigned to IPS #31, Ms. Howard's duties included "facilitating, monitoring, and providing comprehensive mental health care management and therapy services to mentally ill and emotionally disturbed students at [IPS #31]." Floyd Aff. ¶ 5.  In addition to counseling services and providing behavioral therapy, Ms. Howard's duties included escorting students off school property to medical and skill-building appointments, for example, the library.  Pltf. First Dep. at 37:12-22; Pltf. Second Dep. at 12:3-19.  While assigned to IPS #31, Ms. Howard was expected to abide by IPS #31 protocols and policies as well as Community's expectations.  Floyd Aff. at ¶ 6.  One such policy required "anyone who removes a child from the building to sign the student out on the 'Student Sign Out/In' sheet located in the School's administrative office," which required identifying the time out of the building, return time, student name, room number, and signature of the individual removing the student from the building.  Heiple Dec. ¶¶ 5, 9.

Jacqueline Goldstein was a Community employee who worked as a Care Coordinator in Community's Behavioral Care Services department.  Affidavit of Cory E. Liles ("Liles Aff.") ¶¶ 5, 6.[8]  In this role, Ms. Goldstein "was not based at any particular

---

[8] Cory E. Liles is employed by Community as a Human Resources Director.  Liles Aff. ¶ 3.

IPS school" and "regularly traveled to the homes and schools of the students with whom she worked." *Id.* ¶ 9.  Ms. Goldstein reported to William Wischnowski, a Community operations director.  *Id.* at ¶ 7.  Ms. Howard alleges Ms. Goldstein is Caucasian and under the age of 40 years.  SAC ¶ 16.

**C.     The Incident at Issue**

On the morning of August 6, 2013, during school hours, Ms. Howard and Ms. Goldstein removed a student from IPS #31 and accompanied that student to a medical appointment.  Pltf. First Dep. at 101:25-102:14, 103:15-23.  Prior to the time of the appointment, Ms. Goldstein came to Ms. Howard's office to inform her that a student needed to be taken to a medical appointment off school property.  *Id.* at 104:2-9.  Ms. Goldstein and Ms. Howard retrieved the student from the classroom, informing the teacher that they were accompanying the student to a medical appointment.  *Id.* at 106:4-7.  They then took the student to the office where Ms. Howard told the school secretary that there was an emergency and asked the office to inform the teachers that she was leaving.  Floyd Aff. ¶ 15.  Although Ms. Goldstein signed herself out when she left IPS #31 (she had signed herself in when she arrived at the School), according to the IPS # 31 sign out sheets, neither the student nor Ms. Howard was signed out of the building.  *Id.* ¶¶ 15, 18.  The school staff became confused because Ms. Howard told the teacher she was taking the student for an appointment, but then told the office that she had an emergency and the student was unaccounted for in the building or on the sign out sheet.  This prompted the student's teacher, Principal Heiple, and three other staff members to search for the missing student.  Heiple Dec. ¶¶ 7-8.  The School then contacted Ms. Floyd, who contacted Ms. Howard,

and Ms. Howard assured Ms. Floyd that the missing student was safely with her at a medical appointment and communicated as much to the student's teacher.  Floyd Aff. ¶¶ 7-8.

Although the sign out sheet shows differently, Ms. Howard believes that she saw Ms. Goldstein sign the student out before they left the school.  Pltf. First Dep. at 106:25-107:1.[9]  Ms. Howard maintains that it was common practice for her to not sign students out when she escorted them to appointments.  *Id.* at 116:9-14.  Ms. Howard testified that prior to removing the student from IPS #31 she informed her immediate supervisor, Ms. Floyd, of the medical appointment.  Pltf. Second Dep. at 28:6-14.

Ms. Floyd went to IPS #31 approximately two hours after speaking with Ms. Howard on the telephone.  Upon arriving at the school, Ms. Floyd spoke with an office employee, Faye Carpenter, and the school principal, Ms. Heiple.  Floyd Aff. ¶ 10-11. Although Ms. Carpenter knew that Ms. Howard was leaving the school, she was not aware that Ms. Howard was taking a student out of the school.  *Id.* ¶ 10.  Making reference to Ms. Howard's previous lack of communication with the School, Principal Heiple was particularly concerned with the Incident because it involved removal of a student from School and the possibility of liability because the School had "no concrete information to

---

[9] The student left IPS #31 in Ms. Howard's car and Ms. Goldstein led the way to the student's mother's home.  Pltf. First Dep. at 111:2-15.  At that point, the mother drove the student, Ms. Howard and Ms. Goldstein followed in their own cars to the medical appointment.  Pltf. Second Dep. at 27:4-17.  Ms. Howard stayed for the duration of the appointment (Ms. Goldstein left) and the student was returned to the school by his/her mother.  *Id.* at 27:18-24.

provide to the child's parents if they contacted the School regarding their child's whereabouts." *Id.*

When Ms. Floyd spoke with Ms. Howard, Ms. Howard shared general information about the purpose of the student's appointment, but did not provide complete details surrounding the circumstances of the Incident. *Id.* Ms. Floyd's ability to determine how to proceed was stymied by a lack of information from Ms. Howard. *Id.*

### D. Investigation of the Incident

On the afternoon of August 6, 2013, after consulting with Principal Heiple and Community's Human Resources department, and after Ms. Howard refused to provide details of the student's removal from the School, Ms. Floyd informed Ms. Howard that she was to leave IPS #31 "to allow time for an investigation regarding IPS's concern" about the Incident. *Id.* ¶ 12. Ms. Howard was placed on administrative leave while Community investigated the Incident. *Id.* ¶ 18.

Two days after the Incident, on August 8, Ms. Floyd and Ms. Reed met with Ms. Howard. *Id.* During this meeting, Ms. Howard insisted that the student had been signed out of the School, despite Ms. Floyd showing her copies of the IPS Sign Out/In sheet demonstrably showing that the student had not been signed out. *Id.*

As a result of its investigation, Community concluded that it would take no disciplinary measures against Ms. Howard because, in its determination, she may not have understood IPS #31's sign out procedures, and she did not intentionally fail to follow the correct process. *Id.* ¶ 20. However, IPS's Administrative Coordinator for Students with Emotional Disabilities, William Robinson, conducted an investigation on behalf of IPS.

His investigation involved communicating with Principal Heiple and the office secretary, reviewing the August 6 "Student Sign Out/Sign In" sheet, and speaking with other individuals at the School.  Robinson Dec. ¶¶ 4-5.  He concluded that Ms. Howard had removed the student from the school without signing the student out.  *Id*. ¶¶ 3, 7.  On August 13, 2013, Mr. Robinson informed Community in writing that "IPS did not want [Ms. Howard] returned to School #31 or assigned to any position associated with IPS'[s] emotional disabilities classrooms" as a result of Howard's lack of communication, particularly related to the Incident and safety concerns.  Reed. Aff. ¶ 11.  This decision was communicated to Ms. Howard by Nancy Orbaugh, a member of Community's Human Resources Department.  Pltf. First Dep. at 126:20-127:8; Reed Aff. ¶ 12.  At that time, Ms. Howard raised some concerns about the manner in which she was treated.  Affidavit of Sharon McCullough ("McCullough[10] Aff.") ¶ 5.

Ms. Reed testified that Community lacked the authority to keep Ms. Howard at IPS #31 over the school's objection.  Reed Aff. ¶ 12.  However, neither Mr. Robinson nor Principal Heiple made any requests or recommendations with regard to Ms. Howard's employment with Community.  Heiple Dec. ¶ 12; Robinson Dec. ¶ 10.  Community placed Ms. Howard on leave with "for a period of time to locate another role within Community" but did not terminate her at that time.  Reed Aff. ¶ 15.  After Ms. Howard was removed from IPS #31, Community filled her position with another African-American female.  *Id*. ¶ 13.

---

[10] Sharon McCullough is Vice President of Human Resources for Community.  Aff. ¶ 3.

Although IPS was concerned about Ms. Howard's conduct, it apparently did not express any similar concern about Ms. Goldstein's conduct.  According to Ms. Reed, she was unaware of any IPS teacher or official reporting to Community that Ms. "Goldstein improperly removed a student from IPS school grounds."  Reed Aff. ¶ 17.  Furthermore, IPS made no request following the Incident that Ms. Goldstein not return to IPS #31 or any other IPS school.  *Id.*

Community held a third meeting with Ms. Howard on August 22, 2013.  Reed Aff. ¶ 15; Floyd Aff. ¶ 24.  This meeting was prompted by Ms. Howard expressing concerns about how she had been treated.  McCullough Aff. ¶¶ 5-6; Floyd Aff. ¶ 24.  However, during this meeting Ms. Howard did not provide any details about her concern of mistreatment.  McCullough Aff. ¶ 6.; Reed Aff. ¶ 15; Floyd Aff.  Community concluded its investigation of the concerns raised by Ms. Howard in early October 2013, finding no evidence of mistreatment.  Ms. McCullough then met with the Ms. Howard to inform her that the investigation had ended, her paid leave had ended and that, in compliance with Community policy, Ms. Howard could remain on unpaid leave for up "three months after her assignment with IPS #31 ended," which in this case was until November 11, 2013.  McCullough Aff. ¶ 7.  The purpose of the leave was to give Ms. Howard an opportunity to pursue other positions in Community's network.  *Id.*

Ms. Howard remained on unpaid leave with Community until her employment was terminated on November 11, 2013.  Pltf. First Dep. at 60:16-25, Ex. 10; Liles Aff. ¶¶ 11, 12; McCullough Aff. ¶ 8 (Community has placed other employees on administrative leave (over and under the age of 40 years and Caucasian and African-American alike) and when

they did not secure another position during their administrative leave, their employment was terminated.).   During this time, Ms. Howard applied to "several" unidentified Community positions but did not secure any of these positions, and her employment was terminated.  Pltf First. Dep. at 56:10-58:1; McCullough Aff. ¶ 8; Liles Aff. ¶ 11.

**E.     Plaintiff's Report of IPS Teacher Conduct**

In May 2013, while still employed as a Community School-Based Therapist, Ms. Howard reported to Ms. Floyd and Ms. Reed an incident where she (and Ms. Floyd) observed a teacher at IPS #31 slap a student.  Ms. Howard alleges that Ms. Floyd and Ms. Reed discouraged her from sharing this concern with IPS at that time.  Pltf. Second Dep. at 77:8-14.  Although Ms. Floyd believed the slapping incident was an accident, and Ms. Howard agreed and did not believe the incident warranted a report to Child Protective Services, Ms. Floyd believes she nonetheless discussed Ms. Howard's concern "with someone at IPS shortly after [her] discussion with [Ms. Howard]."  Floyd Aff. ¶ 25.  Ms. Howard did not report the incident to IPS until August 14, 2013, "after IPS had instructed [Community] to not return [Ms.] Howard to IPS #31."  Reed Aff. ¶ 19.

**F.     Plaintiff's Claim**

Ms. Howard filed a discrimination charge against IPS with the EEOC on August 15, 2013.  Pltf. Resp. to Mtns. for Summ. J. at 12.[11]  The EEOC was "unable to conclude that information obtained establish[ed] violations of the statutes."  *Id.* at 8.  Ms. Howard

---

[11] Ms. Howard contends that her EEOC complaint was filed against both IPS and Community, although the complaint submitted into evidence by Ms. Howard shows that her EEOC complaint was filed only against IPS.  *See* Dkt. No. 107 (Pl. Resp. to Mtns. for Summ. J.) at Ex. 3.

12

initiated this lawsuit against IPS on December 26, 2013 and added Community as a defendant on October 9, 2014.

Ms. Howard initiated the instant litigation *pro se* and she is currently without legal representation.  Ms. Howard was represented by counsel from July 3, 2015 through November 7, 2015, including when she filed her Second Amended Complaint ("SAC"), the operative complaint, and when she was deposed the second time.

## Legal Analysis

**A.     Standard of Review—Summary Judgment**

Summary judgment is appropriate when the record shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  Disputes concerning material facts are genuine where the evidence is such that a reasonable jury could return a verdict for the non-moving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In deciding whether genuine issues of material fact exist, the court construes all facts in a light most favorable to the non-moving party and draws all reasonable inferences in favor of the non-moving party.  *See id.* at 255.  However, neither the mere existence of some alleged factual dispute between the parties, *id.* at 247, nor the existence of some metaphysical doubt as to the material facts, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), will defeat a motion for summary judgment.  *Michas v. Health Cost Controls of Illinois, Inc.*, 209 F.3d 687, 692 (7th Cir. 2000).

The moving party bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the record which it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. The party seeking summary judgment on a claim on which the non-moving party bears the burden of proof at trial may discharge its burden by showing an absence of evidence to support the non-moving party's case. *Id.* at 325.

Summary judgment is not a substitute for a trial on the merits, nor is it a vehicle for resolving factual disputes. *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). Thus, after drawing all reasonable inferences from the facts in favor of the non-movant, if genuine doubts remain and a reasonable fact finder could find for the party opposing the motion, summary judgment is inappropriate. *See Shields Enter., Inc. v. First Chicago Corp.*, 975 F.2d 1290, 1294 (7th Cir. 1992); *Wolf v. City of Fitchburg*, 870 F.2d 1327, 1330 (7th Cir. 1989). If it is clear that a plaintiff will be unable to satisfy the legal requirements necessary to establish her case, summary judgment is not only appropriate, but mandated. *See Celotex*, 477 U.S. at 322; *Ziliak v. AstraZeneca LP*, 324 F.3d 518, 520 (7th Cir. 2003). Further, a failure to prove one essential element necessarily renders all other facts immaterial. *Celotex*, 477 U.S. at 323.

This summary judgment standard is not relaxed for pro se litigants like Plaintiff. *Arnett v. Webster*, 658 F.3d 742, 760 (7th Cir. 2011) (noting that the plaintiff's "pro se status does not alleviate his burden on summary judgment"). In other words, to defeat Defendant's motions, Ms. Howard must come forward with evidence that creates genuine dispute over a material fact such that a reasonable jury could return a verdict in her favor.

*Walker v. Eli Lilly & Co.*, No. 1:10-CV-01700-RLY, 2013 WL 1180870, at *4 (S.D. Ind. Mar. 20, 2013) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

The summary judgment standard is applied rigorously in employment discrimination cases, because intent and credibility are such critical issues and direct evidence is rarely available. *Seener v. Northcentral Technical Coll.*, 113 F.3d 750, 757 (7th Cir. 1997); *Wohl v. Spectrum Mfg., Inc.*, 94 F.3d 353, 354 (7th Cir. 1996). To that end, we carefully review affidavits and depositions for circumstantial evidence which, if believed, would demonstrate discrimination. However, the Seventh Circuit has also made clear that employment discrimination cases are not governed by a separate set of rules, and thus remain amenable to disposition by summary judgment so long as there is no genuine dispute as to the material facts. *Giannopoulos v. Brach & Brock Confections, Inc.*, 109 F.3d 406, 410 (7th Cir. 1997).

**B.     Standard of Review—Employment Discrimination**

Ms. Howard's claims of racial discrimination and retaliation under Title VII and § 1981 (as to race discrimination) and her claim of age discrimination in violation of the ADEA invoke the Seventh Circuit's recent decision in *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760 (7th Cir. 2016); *see also Turner v. Nice-Pack Prods., Inc.*, No. 1:15-cv-00539-SEB-DML, 2017 WL 119393 at *7-8 (S.D. Ind. Jan. 12, 2016).

In *Ortiz v. Werner Enterprises, Inc.*, the Seventh Circuit eliminated the sub-methodologies and analytical divisions of evidence which had developed under the so-called direct method of proof to replace that "rat's nest surplus of 'tests'" with a single issue: "whether the evidence would permit a reasonable factfinder to conclude that the

plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action."  834 F.3d at 765, 766.  Under this new, "simplified" approach, the "[e]vidence must be considered as a whole, rather than asking whether any particular piece of evidence proves the case by itself—or whether just the 'direct' evidence does so, or the 'indirect' evidence." *Id.*

The *Ortiz* court noted that its decision did "not concern *McDonnell Douglas* or any other burden-shifting framework." *Id.* at 766.  However, in the short period of time since that decision, the Seventh Circuit has stated that the straightforward inquiry in *Ortiz* has, indeed, "replaced the notion of two distinct *methods of proof* – the 'direct' and 'indirect." *Harris v. Office of the Chief Judge of the Circuit Court of Cook Cnty.*,—Fed. Appx.—, 2016 WL 7228703, at *2 (7th Cir. Dec. 13, 2016) (emphasis added).  Under the *McDonnell Douglas* test to establish a prima facie case of discrimination a plaintiff must offer evidence that: (1) he is a member of a protected class, (2) his job performance met the employer's legitimate expectations, (3) he suffered an adverse employment action, and (4) another similarly situated individual who was not in the protected class was treated more favorably than the plaintiff.  *Coleman v. Donahoe*, 667 F.3d 835, 845 (7th Cir. 2012) (citation omitted).  Once a prima facie case is established, a presumption of discrimination is triggered.  The burden then shifts "to the employer to articulate some legitimate, nondiscriminatory reason" for its action. *McDonnell Douglas,* 411 U.S. at 802.  When the employer does so, the burden shifts back to the plaintiff, who must present evidence that the stated reason is a "pretext," which in turn permits an inference of unlawful discrimination. *Id.* at 804.

We struggle to reconcile the Seventh Circuit's clear preference for a single, simplified approach in analyzing claims of discrimination with the continued existence and applicability of the Supreme Court's directives in *McDonnell Douglas*.  To do so, we shall view *McDonnell Douglas* as simply one pattern – one of many – superimposed on the evidence in an effort to enable a reasonable trier of fact to determine discrimination.  *See Knapp v. Evgeros, Inc.*,—F. Supp. 3d—, 2016 WL 4720026, at *6 (N.D. Ill. Sept. 9, 2016). However, a district court need not limit itself to analyzing the evidence only according to the *McDonnell Douglas* template, nor should it be bound by the formulaic foxtrot which has developed under that framework.

## C.    Claims against IPS

Initially, we address the threshold legal issue of whether Ms. Howard was an employee of each Defendant as Title VII and the ADEA are applicable only to an employee-employer relationship.  *See* 42 U.S.C. § 2000e-3; 29 U.S.C. § 621.  Both Title VII and the ADEA define an employee as "an individual employed by an employer."  42 U.S.C. § 2000e(f); 29 U.S.C.A. § 630(f).

Ms. Howard bears the burden of establishing an employment relationship between her and each defendant.  Under certain limited circumstances, a plaintiff can bring a claim against a defendant who is not her direct employer.  The Seventh Circuit employs an "economic realities" test to evaluate whether the requisite control exists for an employee-employer relationship.  For this test, the Seventh Circuit looks to the following five factors:

(1) the extent of the employer's control and supervision over the employee;
(2) the kind of occupation and nature of skill required, including whether skills are acquired on the job; (3) the employer's responsibility for the costs

> of operation, such as equipment, supplies, fees, licenses, workplace, and
> maintenance of operations, (4) method and form of payment and benefits;
> and (5) length of job commitment and/or expectations.

*Love v. JP Cullen & Sons, Inc.*, 779 F.3d 697, 702 (7th Cir. 2015) (citing *Knight v. United Farm Bureau Mut. Ins. Co.*, 950 F.2d 377, 378-79 (7th Cir. 1991)).  The employer's right to control the employee is the most important factor for determining whether an individual is an employee of the defendant.  *Id*.

Ms. Howard alleges that IPS and Community are joint employers.  Dkt. No. 107 at 7 ("At all relevant times, Howard has been an 'employee' of both [Community] and IPS, . . . .").  A joint-employer relationship exists when "each alleged employer [exercises] control over the working conditions of the employee."  *Moldenhauer v. Tazewell-Pekin Consol. Commc'ns Cntr.*, 536 F.3d 640, 644 (7th Cir. 2008).  Not only has Ms. Howard failed to put forth any evidence that establishes a joint employer-employee relationship with IPS and Community, but the evidence demonstrates that Community was her sole employer, not IPS.  Community does not contest that Ms. Howard is a Community employee, and concurs with IPS that Ms. Howard is not an IPS employee.  *See* Community Mtn. for Summ. J. Br. at 3.  Ms. Howard applied to and was hired by Community, was placed on administrative leave by Community, and ultimately her employment was terminated by Community.  *See Love*, 779 F.3d at 703 ("[W]hen control is examined, 'the key powers are, naturally, those of hiring and firing.'") (citations omitted).  It was Community who assigned Ms. Howard to IPS School #31.  Heiple Dec. ¶ 6.  During her employment with Community she reported to a Community employee, Ms. Floyd, who reported to another Community employee, Ms. Reed.  Community determined Howard's

schedule, including start and end time, hourly expectations, and documentation requirements. Ms. Howard was paid by Community and was *not* paid by IPS. Ms. Howard also received health benefits from Community and not IPS. When filing a wage claim with the Indiana Department of Labor and an Unemployment Insurance Appeal, Ms. Howard identified Community as her employer.

We acknowledge that according to the terms of the agreement between IPS and Community, IPS had the authority to request that Community not place Ms. Howard at School #31 or be assigned to any position associated with IPS's emotional disabilities classrooms. Although IPS could, and did here, prevent specific Community employees from providing services in fulfillment of Community's contract, IPS could not select and assign Community employees to its schools or positions therein and could not hire or fire Ms. Howard. *See* Reed Aff. ¶ 5. Community's agreement to remove a provider at IPS's request is not enough to prove that IPS was Ms. Howard's employer.

We conclude that Ms. Howard has failed to meet her burden of demonstrating an employee-employer relationship existed between herself and IPS, and summary judgment is hereby GRANTED in favor of IPS on all of Ms. Howard's claims against it.

**D.     Claims against Community**

**1.     Race Discrimination**

Ms. Howard alleges that Community discriminated against her on the basis of her race in violation of both Title VII and § 1981. According to § 1981, "[a]ll persons within the jurisdiction of the United States shall have the same right . . . to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and

proceedings for the security of persons and property as is enjoyed by white citizens."  42 U.S.C. § 1981.  Under Title VII, it is unlawful for an employer "to discharge any individual, or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race."  42 U.S.C. § 2000e-2.  The Seventh Circuit has ruled that, when these two claims are brought together, they may be discussed together because they employ "essentially identical" requirements.  *Morgan v. SVT, LLC* 724 F.3d 990, 995 (7th Cir. 2013) (citing *McGowan v. Deere & Co.*, 581 F.3d 575, 579 (7th Cir. 2009)).   Therefore, we will discuss Ms. Howard's race discrimination claim with respect to both Title VII and § 1981 concurrently.

Ms. Howard has alleged that she was terminated from her employment because of her race.  As best as we can tell, Ms. Howard structures her evidence in support of this claim within the *McDonnell-Douglas* framework, arguing that Ms. Goldstein is a comparator who received favorable treatment.  It is undisputed that Ms. Howard is a member of a protected class because she is African American and that she suffered an adverse employment action because she was terminated.  We look to whether Ms. Howard was meeting her employer's legitimate expectations, whether a similarly situated comparator was treated more favorably, and whether Community's reason for terminating Ms. Howard was a pretext for discrimination.  We also look at the evidence as a whole to determine whether a reasonable juror could conclude that Ms. Howard was discriminated against.

**Employer's Legitimate Expectations.**  It is undisputed that Ms. Howard's job expectations included abiding by IPS policies and procedures, which required signing

students out of the school on a sign out sheet.  Floyd Aff. ¶ 6.  It is also undisputed that

Ms. Howard failed to sign the student of out school causing confusion as to the

whereabouts of an the unaccounted for student.  Ms. Howard does not dispute that *she* did

not sign the student out when she left with him/her.

Community decided not to reprimand Ms. Howard for her failure to sign the student

out of IPS #31 because it concluded that Ms. Howard did not knowingly and willfully

disregard the School's policy.  IPS, on the other hand and within its rights, demanded that

Ms. Howard not return to IPS #31 or any position with IPS's emotional disabilities

classrooms.  Because Ms. Howard did not follow IPS's policies and was no longer able to

work in her capacity within IPS schools, Ms. Howard was not fulfilling the legitimate

expectations of Community.

**Comparator.**  Ms. Howard has not demonstrated that a similarly situated non-

African American employee received more favorable treatment than she received.  "A

similarly situated employee must be directly comparable to [Ms. Howard] in all material

respects, which is a common-sense, flexible analysis of relevant factors.  These relevant

factors often include whether the employees 'had the same supervisor, were subject to the

same employment standards, and engaged in similar conduct.'"  *Cung Hnin v. TOA (USA),

LLC*, 751 F.3d 499, 504 (7th Cir. 2014) (quoting *Majors v. General Elec. Co.*, 714 F.3d

527, 738 (7th Cir. 2013)).  The similarly situated employee analysis is not meant to be "a

mechanical comparison" but, more broadly, to "eliminate confounding variables, such as

differing roles, performance histories or decision-making personnel."  *Id.* at 504-05

(quoting *Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 405 (7th Cir. 2007)).

21

The only comparator identified by Ms. Howard is Ms. Goldstein.  *See* SAC ¶ 16; Dkt. No. 107 ("Jacqueline [Goldstein] my comparator met these criteria and was treated more favorably, . . . .").[12]  Ms. Howard argues, without providing any supporting evidence, that she and Ms. Goldstein "(1) dealt with the same supervisor, (2) [were] subject to the same standards, and (3) engaged in similar conduct without differentiating or mitigating circumstances" and that "[Ms. Goldstein her] comparator met these criteria".  Dkt. No. 107 (Pltf. Resp. to Mtns. for Summ. J.) at 9.

Defendants rejoin that the evidence demonstrates that Plaintiff and Ms. Goldstein were not similarly situated, to wit, Ms. Howard was a School-Based Therapist based at IPS #31, whereas Ms. Goldstein was a Care Coordinator in Community's Behavioral Care Services Department, which is not a part of the school-based programs.  Reed Aff. ¶ 17; Liles Aff. ¶ 6.  The two positions differed in responsibilities and placement arrangements. Liles Aff. ¶ 9.  As a School-Based Therapist, Ms. Howard reported to Ms. Floyd, who in turn reported to Ms. Reed, whereas Ms. Goldstein reported to neither Ms. Floyd nor Ms. Reed, but reported to Mr. Wischnowski.  Reed Aff. ¶ 8; Liles Aff. ¶ 7.  Ms. Goldstein and Ms. Howard did have some similar job duties, such as providing services for mental illness and severe emotional disturbances, but those services were provided to different people in different locations and in varying degrees.   Ms. Goldstein regularly traveled to IPS

---

[12] In her opposition, Ms. Howard makes passing reference to Leroy Alexander, a former IPS employee who is also African American.  Although it seems to us that Ms. Howard believes it was unfair that Mr. Alexander's employment with IPS was terminated, she does not contend that he is relevant to her lawsuit against IPS/Community and we cannot discern any reason to consider his letter in support of Ms. Howard's response to defendants' motions [*see* Dkt. No. 107-1 at 1-2].

students' homes and school, unlike Ms. Howard, who was not based at any particular IPS school.   Liles Aff. ¶ 8.   These distinctions are significant, as one could conclude that because Ms. Howard, who was based at the School and responsible for driving students, would know and follow IPS's policies.

Their roles in the Incident are distinguishable as well.   At least as Ms. Howard recalls the situation and insists, Ms. Goldstein signed the student out of the School and Ms. Howard did not.   It is undisputed that the student was transported in Ms. Howard's vehicle to the medical appointment and that Ms. Howard stayed with the student during the appointment (and Ms. Goldstein did not).

IPS's response is also distinguishable.   IPS made no demand that Ms. Goldstein not return to IPS #31 or continue her work with IPS in her Care Coordinator capacity.   Reed Aff. ¶ 17.   And, as we know, IPS told Community not to return Ms. Howard to IPS #31 or to work with any other of its emotional disability classrooms.

"The purpose of the 'similarly-situated' comparator is to ensure that all other variables are discounted so that discrimination can be inferred.   'If an employer takes an action against one employee in a protected class but not another outside that class, and all else is equal between the comparators, we can infer discrimination, at least provisionally at the prima facie stage of the analysis.'" *Arizanovska v. Wal-Mart Stores, Inc*., 682 F.3d 698, 703 (7th Cir. 2012) (quoting *Silverman v. Bd. of Educ.,* 637 F.3d 729, 742 (7th Cir. 2011)).   Ms. Goldstein is not a similarly-situated comparator.   Based on all of the facts above that distinguish Ms. Goldstein from Ms. Howard, we cannot conclude that, other than race, "all else is equal between" Ms. Goldstein and Howard to infer discrimination.

23

**Pretext.**   Ms. Howard also is unable to show that Community's reason for terminating her was pretextual.  "'[P]retext' . . . neither in ordinary language nor in the law . . . mean[s] a mistake. It means a lie, specifically a phony reason for some action." *Russell v. Acme-Evans Co.*, 51 F.3d 64, 68 (7th Cir. 1995).  Pretext further "means something worse than a business error; 'pretext' means deceit used to cover one's tracks." *Kulumani v. Blue Cross Blue Shield Ass'n*, 224 F.3d 681, 684 (7th Cir. 2000).

Ms. Howard has presented no evidence that she was terminated for any reason other than her failure to follow the policies of Community and IPS, which resulted in IPS's demands that she not be returned to IPS #31 or its other emotional disability classrooms, and that after her 90-day administrative leave expired, she was unable to secure another position at Community.  There is no evidence in the record that Ms. Howard's termination on these grounds was a lie or that Community was being deceitful in an attempt to cover its tracks.

**Evidence Considered as a Whole.**  Asking "the sole question that matters" as the Seventh Circuit directs, a reasonable juror could not conclude that Ms. Howard would have kept her job if she were of a different race.  The series of events leading to her termination were as follows:  Ms. Howard failed to sign a student out of school when taking him/her out of School and in her car for the purposes of a medical appointment, IPS then requested that Ms. Howard not return to IPS #31 or any position in which she would work with kids in their emotional disabilities classrooms, Community honored that request (as it was obligated to do pursuant to the parties' agreement) and Ms. Howard was allowed 90-days in which to locate another position at Community.  Upon the expiration of her leave and

24

having not found another position with Community,[13] Ms. Howard was terminated and her position with IPS #31 was filled by an African American female.  The only employee upon which Ms. Howard compares herself is Ms. Goldstein, an employee with a different job title, fulfilling different duties, different supervisors, playing a different role in the Incident and who IPS did not request Community remove from her position at IPS.

Viewing the evidence as a whole, as we are required to do under *Ortiz*, Ms. Howard has failed to adduce evidence to show that she was terminated due to her race and no reasonable juror could conclude that she was terminated because of her race.  For these reasons, Community's motion for summary judgment related to Ms. Howard's race discrimination claim is GRANTED.

## 2.    Age Discrimination

Ms. Howard claims that she was discharged from her employment with Community due to her advanced age (over 40 years).  The ADEA prohibits employers from, among other things, "discharge[ing] any individual . . . because of such individual's age."  *Van Antwerp v. City of Peoria, Ill.,* 627 F.3d 295, 297 (7th Cir. 2010) (quoting 29 U.S.C. § 623(a)(1)).

"To establish her claim under the ADEA, [Ms. Howard] must show that her age 'actually motivated' [Community's] decision to terminate her employment."  *Faas v. Sears, Roebuck & Co.*, 532 F.3d 633, 641 (7th Cir. 2008).  ADEA claims are analyzed under the same famework as Title VII claims, which *Ortiz* tells us is to ask whether "a

---

[13] Ms. Howard does not claim that she was discriminated against in her efforts to find another position with Community.

reasonable factfinder [could] conclude that the plaintiff's [age] caused the discharge or other adverse employment action." *Ortiz*, 834 F.3d at 765; *Nagel v. Village of Calumet Park*, 554 F.3d 1106, 1114 n.3 (7th Cir. 2009) ("We apply the same analytical framework to employment discrimination cases whether they are brought under the ADEA or Title VII."). Ms. Howard may defeat summary judgment by presenting evidence that, considered as a whole, would allow a reasonable juror to conclude that she was discriminated against due to her age. Ms. Howard has not met this burden.

Ms. Howard's age discrimination claim is based on two situations. First, in her SAC, Ms. Howard alleges that she was "discriminat[ed] against on the basis of her age when Goldstein, a similarly-situated younger employee, who had *actually* engaged in the conduct of which Howard was accused, was afforded more favorable terms and conditions of employment than Howard, in that Goldstein was not placed on administrative leave or terminated." SAC ¶ 32 (emphasis in original). Second, Ms. Howard alleged in her deposition, although not in her SAC, that during her initial job *interview* with Community she was told that she would be more appropriate for an IPS position, rather than a supervisory position, because Community "looked for employees within and younger blood." *See* Pltf. Second Dep. at 94:1-11.

With regard to the allegations in her SAC, Ms. Howard's evidence largely overlaps with the evidence put forward in support of her race discrimination claim. Ms. Howard contends that both she and Ms. Goldstein were involved in the Incident, but Ms. Howard was terminated and Ms. Goldstein suffered no adverse employment event. Because Ms.

Howard is over 40 years old, and Ms. Goldstein is not, Ms. Howard claims she was the victim of age discrimination.

One way the evidence might allow a reasonable juror to find that Ms. Howard was discriminated against because of her age is the *McDonnell Douglas* burden shifting test articulated above.  As we analyzed above, Ms. Howard's proposed comparator, Ms. Goldstein, is not substantially similar to Ms. Howard because they had different job titles, different supervisors, performed differed job duties, their involvement in the Incident differed and, most importantly, IPS requested that Ms. Howard not return to IPS #31 but made no similar request as to Ms. Goldstein.  Further, and as discussed above, Ms. Howard is unable to demonstrate that she was meeting Community's legitimate job expectations. Ms. Howard casts no doubt on the credibility of Community's reason for terminating her employment, to wit, Ms. Howard's failure to follow IPS's policies resulting in IPS's request that Ms. Howard not return to School #31 or work with emotionally disabled classrooms at IPS, and Ms. Howard's inability to secure another position in Community's network before the conclusion of a 90-day leave period.

Ms. Howard claims that during her interview, she was told that Community hires "younger blood" and that an IPS position, as opposed to a supervisory position, would be better for her.  Ms. Howard's interview occurred sometime between her application (January 15, 2013) and her hire date (March 11, 2013).  This comment, assuming its truth as we must on summary judgment, is not connected to Ms. Howard's termination eight months later.  "Isolated comments are not probative of discrimination unless they are 'contemporaneous with the discharge or causally related to the discharge decision-making

27

process.'" *Fleishman v. Cont'l Cas. Co.*, 698 F.3d 598, 605 (7th Cir. 2012) (quoting *Gleason v. Mesirow Fin., Inc.,* 118 F.3d 1134, 1140 (7th Cir.1997)).  In *Flieshman*, the Seventh Circuit found a comment made ten months before termination is not "contemporaneous."  *Id.* (citing *Markel v. Bd. of Regents of Univ. of Wis. Sys.,* 276 F.3d 906, 910–11 (7th Cir.2002) (two months before termination not contemporaneous); *Kennedy v. Schoenberg, Fisher & Newman, Ltd.,* 140 F.3d 716, 724 (7th Cir.1998) (five months not contemporaneous)).  Here, there is no connection between a statement made at the latest on March 11 and Ms. Howard's termination eight months later.

Thus, viewing the evidence as a whole, no reasonable juror could conclude that Ms. Howard's termination would not have occurred but for Community's age-based discriminatory motive.  Accordingly, Community is entitled to summary judgment on Ms. Howard's age discrimination claim.

### 3.    Retaliation in Violation of Title VII and the ADEA

Ms. Howard's retaliation claim cannot survive summary judgment because she has failed to establish that she engaged in statutorily protected activity and was fired as a result. Title VII and the ADEA have the same requirements for establishing a retaliation claim, therefore we discuss the two avenues for Ms. Howard's relation claim together.  *Scruggs v. Garst Seed Co.*, 587 F.3d 832, 838 (7th Cir. 2009); *Smith v. LaFayette Bank & Trust Co.*, 674 F.3d 655, 657-58 (7th Cir. 2012).

According to Title VII, an employer may not "discriminat[e] against an employee who has 'opposed any practice' made unlawful by Title VII or who 'has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing'

under Title VII.'" *Scruggs*, 587 F.3d at 838 (citing 42 U.S.C. § 2000e-3(a)).  Ms. Howard

must prove that her termination was instigated by her "complaining about prohibited

discrimination." *Jaburek v. Foxx*, 813 F.3d 626, 633 (7th Cir. 2016) (quotation marks and

citation omitted); *see Bagwe v. Sedgwick Claims Mgmt. Servs., Inc.*, 811 F.3d 866, 888

(7th Cir. 2016) (holding that the plaintiff's complaint regarding pay was not protected

activity as she did not mention race or discrimination); *Kodl v. Bd. of Educ. Sch. Dist. 45*,

490 F.3d 558, 563 (7th Cir. 2007) ("To constitute protected expression, the complaint must

indicate the discrimination occurred because of sex, race, national origin, or some other

protected class.  Merely complaining in general terms of . . .  harassment, without

indicating a connection to a protected class or providing facts sufficient to create that

inference, is insufficient.") (internal quotation marks and citation omitted).

     Ms. Howard has provided no evidence that she engaged in a statutorily-protected

activity for which she suffered retaliation in violation of Title VII "and/or" the ADEA.  Ms.

Howard's claim is rooted in her report to her supervisor, Ms. Floyd, that she witnessed a

teacher at IPS #31 slap a student.  Ms. Howard's report of the teacher's conduct does not

fall within the realm of protected activity under Title VII:  Title VII protects employees

who "oppos[e] any practice made an unlawful employment practice by [Title VII] or

because [the employee] has made a charge . . . . or participated in any manner in an

investigation, proceeding, or hearing under [Title VII]." 42 U.S.C. § 2000e-3(a).  In short,

neither a teacher slapping a student nor the employee's report of such an incident

constitutes an unlawful employment practice under Title VII, and, therefore, Ms. Howard's

report of such conduct is not protected under Title VII.

For these reasons, no genuine issue of material fact exists and Defendant is entitled to judgment as a matter of law.  Community's motion for summary judgment with respect to Ms. Howard's retaliation count is GRANTED.

### Conclusion

For these reasons, we hereby GRANT Defendant IPS's motion for summary judgment [Dkt. No. 120] and GRANT Defendant Community's motion for summary judgement [Dkt. No. 124].  Final judgment shall enter in favor of the Defendants.

**IT IS SO ORDERED.**

Date:   3/29/2017

*Sarah Evans Barker*

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution:

BILLIE J. HOWARD
7244 Lakeside Woods Dr.
Indianapolis, IN 46278

Counsel of record via CM/ECF